IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

|  |  |  |
|---|---|---|
| RAZORBACK CONCRETE COMPANY | * * * * | |
| Plaintiff | * * | NO: 3:07CV00135 SWW |
| VS. | * * | |
| DEMENT CONSTRUCTION, LLC | * * | |
| Defendant | * * * * * | |

**ORDER**

Plaintiff Razorback Concrete Company ("Razorback") commenced this contract dispute against Dement Construction, LLC ("Dement") pursuant to the Court's diversity jurisdiction, and Dement counterclaimed. The case is before the Court on Dement's motion for summary judgment (docket entries #72, #73, #74), Razorback's response in opposition (docket entries #81, #82, #86), and Dement's reply (docket entry #87). After careful consideration, and for reasons that follow, Dement's motion is granted in part and denied in part.

**I. Background**

This case arises from a highway bridge construction project, which included modifying an existing bridge in Crittenden County, Arkansas near the Tennessee/Arkansas border to make the bridge more resistant to seismic activity. The Tennessee Department of Transportation ("TDOT") served as the managing agent for the project, and Dement served as the prime

contractor. On April 27 2006, Razorback faxed a quote and a revised quote to Dement for supplying ready mix concrete for the bridge project, and on May 17, 2006, Razorback faxed an amended quote to Dement.

Dement mailed Razorback a purchase order, dated June 6, 2006, which specifies three types of concrete, described in terms of TDOT classes and PSI (strength) ratings, at specified prices per cubic yard. Under the heading "APPRX. QUANTITY," the purchase order reads: "AS REQUIRED." The purchase order also contains the following specifications:

>CLASS D CONCRETE SHALL HAVE LIMESTONE AGGREGATE
>
>SUPPLIER SHALL BE RESPONSIBLE FOR OBTAINING THE REQUIRED CONCRETE MIX DESIGNS.
>
>SUPPLIER SHALL BE RESPONSIBLE FOR ALL TESTING AT THE PLANT AS REQUIRED BY SECTION 604 OF THE SPECIFICATIONS CONTRACT GOVERNING THIS PROJECT.
>
>MATERIALS ARE TO MEET THE PLANS AND SPECIFICATIONS OF THIS PROJECT.
>
>PRICES ARE FIRM THRU 12/31/06.
>
>TERMS: NET 20 DAYS AFTER DELIVERY.
>
>THE ABOVE PRICES ARE PLUS APPLICABLE SALES TAX.
>
>OFCCP Rules and Regulations 41 C.F.R. 60-1.4(a); 41 C.F.R. 60-250.4(e); 41 C.F.R. 60-741.4(a) and 41 C.F.R. 61-250.10 are incorporated in this agreement by reference.
>
>Forms PR-1273; Form 7-2(a); Special Provisions Regarding Certification of Non-Segregation of Facilities; Special Provision Regarding Material Purchase; Special Provision Regarding Health and Safety become a party of the Purchase Order and have already been submitted to the Material Supplier.

Docket entry #74, Attach. #1.[1]  Under the heading "ACCEPTANCE," the purchase order is signed by Razorback's general manager, H. Keith Wetsell ("Wetsell"), and Dement's managing member, William D. Dement ("Mr. Dement").

Dement alleges that beginning in September 2006, tests indicated that a portion of the concrete supplied by Razorback did not meet specified strength standards.  Dement further alleges that after Razorback changed its mix design in December 2006, the instances of failed strength tests ceased temporarily, but started again in March 2007.

According to Razorback, the concrete it supplied was ultimately accepted and the initial test results, which indicated that the concrete did not meet strength specifications, were unreliable due to poor handling of test cylinders.  *See* Wetsell Aff. (docket entry #74, Attach. #8), ¶ 6.  Additionally, Razorback contends that Dement alone shouldered the responsibility to make, store, cure, and transport test cylinders.  *Id*.

By letter dated April 4, 2007, Dement's vice president Charles Tyson Capps ("Capps") complained to Wetsell that job progress was being delayed due to "low concrete breaks," *i.e*., the failure of concrete to meet strength specifications.  *See* docket entry #81, Attach. #10.  Capps' letter states in part: "We understand your position that all of the low breaks eventually gained enough strength to be acceptable enough to leave in place with little or no penalty, but allowing time to gain those strengths has delayed this project." *Id*.  Capps' letter states that instead of removing the concrete in place, which would have cost Razorback "well beyond $ 1,000,000," Dement chose to wait the additional time required for the concrete to gain

---

[1]Parties' exhibits cited in this order match CMECF attachment numbers, which do not necessarily match the parties' exhibit numbers.

strength. Capps proposed in his letter that Razorback share a portion of the costs associated with project delays. *Id*.

By letter to Capps dated April 11, 2007, Razorback's president W. Kent Ingram, Jr. ("Ingram"), restated Razorback's position that "the concrete did not fail but rather the tests did." Docket entry #81, Attach. #12. Ingram offered to cooperate in efforts to reach an amicable agreement regarding delay costs but requested specific information regarding the alleged delays. Ingram concluded the letter by asking whether it was Dement's intention to set off payments to Razorback for future concrete deliveries and stating that he would assume that Dement would pay for material as delivered unless informed otherwise.

By letter to Capps dated May 8, 2007, Ingram advised Capps, who had not replied to his April 11 letter, as follows: "Razorback . . . treats your failure to respond . . . as your representation . . . that the current dispute set out in your April 4, 2007 letter . . . is separate and apart from the continued business relationship the two companies have, and Razorback . . . will rely upon your failure to respond . . . as your representation . . that no monies due Razorback . . . for deliveries of concrete to the job sit will be withheld as an offset . . . If I am incorrect, then you must notify me in a writing received by me prior to the close of business Friday, May 11, 2007. Should you later try to offset moneys due Razorback . . . , not only will Razorback . . . have a breach of contract claim against your company, but a claim for fraud, deceit and misrepresentation. Docket entry #81, Attach. #13.

Mr. Dement responded to Ingram by letter dated May 9, 2007, stating that he did not intend to unilaterally deduct payments due Razorback, and he would seek a mutual agreement before any final decision was made. The letter concludes as follows: "We are confident in the

expectation that Razorback . . . will continue to honor and fulfill its existing purchase order to supply ready mix concrete for this project. We will continue to pay all invoices for such ready mix in a timely manner based on this purchase order as we have done in the past." Docket entry #81, Attach. #14.

Subsequent letters between Capps and Wetsell indicate that representatives from Razorback and Dement met on June 14, 2007 and discussed issues and procedures regarding cylinder handling and curing. *See* docket entry #81, Attachs. #15, #16. Apparently, the parties continued to work together during this time period in an effort to reduce instances of failed cylinder tests.

By affidavit, Wetsell testifies that in reliance of Mr. Dement's representation that Dement would pay all invoices for concrete, Razorback continued to deliver concrete to the job site. *See* Wetsell Aff. (docket entry #74, Ex. #9), ¶ 7. According to Wetsell, contrary to Mr. Dement's representation, Dement withheld "substantial sums" due Razorback beginning in June 2007. *Id*.

Dement contends, however, that it paid Razorback as late as August 6, 2007 and did not begin withholding money until after it learned of additional low break problems. *See* Defs.' St. Facts, docket entry #86, ¶ 7. By letter to Wetsell dated September 14, 2007, Capps stated that the estimated cost of removing and replacing defective concrete was $420,000 and that, in an effort to resolve the situation without withholding payment to Razorback, Dement would accept security by way of an irrevocable letter of credit from Razorback for the estimated cost. *See* Wetsell Aff. (docket entry #74, Attach. #8) Attach. #4. The letter concludes: "We will be well along with Phase II before the results of any 28 day cylinders can be known. Removal and replacement of multiple bonds could run into the millions of dollars. If your concrete is good, as

5

you say it is, then you should have not problem standing behind your product." *Id*.

By letter dated September 24, 2007, Wetsell notified Capps that Razorback would continue to provide concrete for two weeks, provided that Dement pay all money owed Razorback by September 26, 2007 and provide, in writing, that any concrete delivered would be the purchase price of the concrete and that Dement would make no claim for damages by way of lost profits, consequential damages, penalties, and the like. *See* Wetsell Aff. (docket entry #74, Attach. #8) Attach. #5. Dement did not respond to Wetsell's proposal, and Razorback stopped delivering concrete to the job site.

On September 26, 2007, Razorback commenced this lawsuit, seeking "monies owed" and punitive damages, alleging that Dement committed fraud by representing that it would pay for concrete supplied by Razorback. Alternatively, Razorback seeks "the monies it is owed" including lost profits under a breach of contract theory.

Dement alleges that after Razorback filed this lawsuit, TDOT determined that the concrete supplied by Razorback, which initially failed to meet strength specifications, gained enough strength to meet specifications. In its answer, Dement alleges that after it learned that the TDOT would accept the concrete, it paid Razorback the entire amount owed for materials supplied less "deductions for items not under the contract between the parties" and "deductions for . . . the failure of Razorback's materials to meet the specifications of the Project." Docket entry #20, ¶ 13. Dement alleges that it deducted Razorback's charges for ice and certain labor charges that were not included in the purchase order.

Along with its answer, Dement filed a counter-complaint, charging that Razorback breached the parties' contract by unilaterally and prematurely terminating its relationship, which

will add approximately $100,000 to $ 125,000 to Dement's project costs. Additionally, Dement claims that Razorback breached the parties' contract by supplying sub-standard concrete.

## II. Choice of Law

The Court is obliged make an independent determination as to which state's law governs the substantive issues in this case. When federal jurisdiction is based on diversity of citizenship, a federal court looks to the choice-of-law principles of the forum state–in this case Arkansas--and applies those principles as the forum state would. *Simpson v. Liberty Mut. Ins. Co.*, 28 F.3d 763, 764 (8th Cir. 1994). In contract actions, when, as in this case, an agreement does not specify the law to be applied, Arkansas Courts have applied the "significant contacts" test, which requires an inquiry into the nature and quantity of each state's contacts with the transaction at issue. *Fuller v. Hartford Life Ins. Co.,* 281 F.3d 704, 706 (8th Cir. 2002); *Southern Farm Bureau Casualty Ins. Co. V. Craven*, 79 Ark. App. 423, 89 S.W.3d 369 (2002).

"In cases not involving an effective choice of law by the parties, the following factors are relevant to the determination of which state has the most significant relationship to a particular case: 1) the place of contracting; 2) the place of negotiation of the contract; 3) the place of performance; 4) the location of the subject matter of the contract; 5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Crisler v. Unum Insurance Co. of America,* 366 Ark. 130, 133, 233 S.W.3d 658, 660 (2006)(citing Restatement (Second) Conflict of Laws § 188 (1971)).

In this case, Razorback is an Arkansas corporation, with a principal place of business in West Memphis, Arkansas; and Dement is a Tennessee limited liability company, with a principal place of business in Jackson, Tennessee. Although Dement alleges, without providing any

supporting evidence, that it did not solicit a bid from Razorback, Wetsell testifies by affidavit that Razorback sent Dement a quote for concrete at Dement's request. *See* Wetsell Aff. (docket entry #74, Attach. #8) ¶ 4. It is undisputed that Razorback faxed the quote to Dement's Tennessee office, and that Dement faxed its purchase order to Razorback's office in Arkansas. In sum, the record shows that the contract at issue was made and negotiated in Arkansas and Tennessee.

Regarding the place of performance, the parties' agreement required Razorback to supply concrete to a job site in Arkansas–the purchase order includes the terms "F.O.B. - JOB SITE - TRUCKS." Additionally, the location of the subject matter of the contract, the bridge and the concrete, were located in Arkansas.

Dement urges the Court to apply Tennessee law because the TDOT served as managing agent for the project, Tennessee allocated more funds than Arkansas for the project, and the concrete supplied by Razorback was tested in Tennessee. However, based on the pertinent factors to be considered, particularly the place of performance and location of the subject matter of the contract, the Court finds that Arkansas has the most significant relationship to the transaction in the present case. Accordingly, the Court finds that Arkansas law governs this dispute.

### III. Summary Judgment

Dement moves for summary judgment,[2] asserting that it is not liable for fraud, breach of

---

[2] Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v.*

contract, lost profits, punitive damages, or attorneys' fees.

## Fraud

Under Arkansas law, the elements of an action for fraud are "(1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance." *Goforth v. Smith*, 338 Ark. 65, 991 S.W.2d 579, 586 (1999).

Razorback claims that by letter dated May 9, 2007, Dement promised to pay all invoices for concrete supplied under the parties' purchase order, knowing that the promise was false and with no intention of keeping the promise. Dement notes that under Arkansas law, an action for fraud may not be predicated on representations related solely to future events and that Dement's letter did not relate to a past event or present circumstance, but merely defined its expectations for the future: that both parties would perform under the contract.

The Arkansas Supreme Court has explained:

In the context of negotiating a contract, a misrepresentation sufficient to form the

---

*Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The non-moving party may not rest on mere allegations or denials of his pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).

>basis of a deceit action may be made by one prospective party to another *and must be related to a past event, or a present circumstance, but not a future event*. "An assertion limited to a future event may be a promise that imposes liability for breach of contract or a mere prediction that does not, but it is not a misrepresentation as to that event.

*South County, Inc. v. First Western Loan Co.*, 315 Ark. 722, 727-28, 871 S.W.2d 325, 327 (1994) (emphasis added) (quoting *P.A.M. Transp., Inc. v. Arkansas Blue Cross & Blue Shield*, 315 Ark. 234, 240, 868 S.W.2d 33, 36 (1993)). Under Arkansas law, an action for fraud can be predicated on a representation regarding future conduct only where the representation is made "in bad faith and without honest intention of performing the promise." *Starling v. Valmac Indus., Inc.*, 589 F.2d 382, 387 (8th Cir.1979); *see also Goforth v. Smith*, 338 Ark. 65, 77, 991 S.W.2d 579, 586 (1999).

Razorback argues: "[Dement] expressed an intent to withhold money, promised not to withhold money only to induce Razorback to supply more concrete, then withheld money within a month despite the fact that there were no legitimate problems with the concrete after [Dement's] promise. This evidence raises an issue of fact regarding defendant's intent, and intend is a question of fact to be determined by a jury." Docket entry #82, at 5.

By letter to Wetsell dated April 4, 2007, Capps *proposed* that Razorback share a portion of the cost associated with project delays. *See* docket entry #81, Ex. #10. The Court finds no evidence that Dement expressed an intent to withhold money. Additionally, the record is void of evidence that Dement could not perform its promise when made, or that Dement made no effort to fulfill its promise. It is undisputed that Dement met with Razorback on June 14, 2007 and continued to pay Razorback's invoices after Mr. Dement's May 9, 2007 letter, *see* Wetsell Aff. (docket entry #74, Ex. #8) ¶ 7. And although Razorback contends that the concrete it supplied

after Dement's promise had "no legitimate problems," it is undisputed that initial tests performed on concrete supplied after Dement's promise to pay showed that the concrete lacked sufficient strength. Rather than support a claim of fraudulent intent, the record indicates that when Mr. Dement stated his expectation that both Razorback and Dement would continue to fulfill their obligations under the purchase order, he intended the same.

"'While fraud may be established by circumstantial evidence, the circumstances must be so strong and well connected as to clearly show fraud.'" *Fowler v. SmithKline Beecham Clinical Laboratories, Inc.*, 225 F.3d 1013, 1016 (8th Cir. 2000)(quoting *Allred v. Demuth*, 319 Ark. 62, 890 S.W.2d 578, 580 (1994)). Under this standard, Razorback's showing is insufficient to show fraud, and Dement is entitled to summary judgment on this claim.

### Breach of Contract

After Razorback commenced this lawsuit, Dement released the funds it owed Razorback for concrete provided, less amounts for charges for ice. Razorback seeks payment for these ice charges under a breach of contract theory, and Dement claims that it has no obligation to pay because ice charges "were not part of any contract between the parties, and there was no mutual assent on these terms." Docket entry #74, at 8.

The purchase order signed by the parties specifies that materials are to meet the plans and specifications governing this project, and TDOT specifications governing the project provide:

> When concrete is being placed during hot weather, appropriate measures shall be taken to reduce the hazards of increased rate of cement hydration and high concrete temperatures. The temperature of concrete at point of discharge shall not exceed 90°F (32°C).
>
> The Contractor shall take any or all, but not limited to, the following precautions to reduce the temperature of the concrete: . . . Use crushed or chipped ice as a portion

of the mixing water, or use water cooled by refrigeration or other means. . . .

Docket entry #74, Ex. #4.

It is undisputed that Dement paid Razorback's invoices that included charges for cold water, necessary to meet the foregoing temperature requirements. Razorback's price quotes, faxed to Dement before the parties signed Dement's purchase order, provide prices for hot and cold water, but contain no prices for ice. *See* docket entry #74, Attachs. #11, #12, #13. In deposition, Capps acknowledged that Dement was responsible to pay for cold water necessary to meet TDOT temperature specifications because Razorback "quoted it and [he] could quantify it when [he] put [his] bid in." Capps Dep. (docket entry #81, Attach. #1) at 40. Apparently, Capps takes the position that Dement is not obligated to pay the cost of items, including ice, that Dement did not include in the project bid it submitted to the TDOT.

The record contains evidence that Razorback delivered ready mix to the job site that was too hot according to TDOT specifications, and a Dement employee directed Razorback employees to add ice. Wetsell testifies: "It was, like, no one knew we were going to need ice until one day out there they shut down unless they added ice, and Ace [Dement's employee] began to add the ice and they said, no, you've got to do it another way, you've got to do it at the plant, so we did it at his request and then ultimately sent a bill for it, which it just never did get added into a–an agreement or anything. It was just there." Wetsell Dep. (docket entry #81, Attach. #11) at 153.

The Uniform Commercial Code ("UCC"), which governs contracts for the sale of goods in Arkansas and the contract at issue in this case, provides that a written contract may be explained or supplemented by evidence of the parties' course of performance. *See* Ark. Code

Ann. § 4-2-202(a); *Bank of Am. v. CD. Smith Motor Co.*, 353 Ark. 228, 106 S.W.3d 425 (2003). A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if: (1) the agreement . . . with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and an opportunity for objection to it, accepts the performance or acquiesces in it without objection. *See* Ark. Code Ann. § 4-1-303.

Here, Razorback has presented evidence that in the course of performing the contract, Razorback supplied ice in order to meet TDOT temperature requirements, initially at Dement's request, which was accepted without objection. Additionally, given that Dement agrees that it was obligated to pay for cold and hot water, items that are not specified in the purchase order, it is reasonable that it would also pay for ice used to regulate concrete temperature. In sum, the Court finds genuine issues for trial with respect to whether the parties' agreement requires Dement to pay for ice charges.

## **Lost Profits**

Razorback claims damages for lost profits in the amount of $318,767 that it "would have earned on the second phase of the project if defendant had not breached the contract." Docket entry #88, at 88. Dement claims that Razorback is not entitled to lost profits as a matter of law and seeks summary judgment on this issue.

Dement initially argues that consequential damages, including lost profits, are not available to sellers under the UCC. To the contrary, the UCC clearly provides that a seller may

13

recover lost profits when other seller's remedies[3] provided under the Code are inadequate to put the seller in as good a position as if the buyer had performed. *See* Ark. Code Ann. § 4-2-708(2).

Dement also argues that Razorback's claim for lost profits is speculative and cannot be proved.[4] The official comments to UCC § 2-708(2) state that the lost profit remedy is applicable in "cases of uncompleted goods, jobbers or middlemen, and other lost-volume sellers." U.C.C. 2-708, Official Comment 5. To qualify as a "lost volume" seller, the seller must show that it could have supplied both the breaching purchaser *and* the resale purchaser with the goods. "If the seller could not or would not have profitably made another sale in absence of breach, there is no lost volume and the seller would normally be made whole by a recovery of the incidental costs associated with the substitute transaction." *Id*.

Dement points to Wetsell's deposition testimony stating that Razorback probably turned away or didn't bid on work during the time it was supplying concrete for the bridge project because "we knew we were kind of at a maximum peak there with their job . . . ." Wetsell Dep. (docket entry #74, Attach. #26) at 166-67. Wetsell also testified that Razorback would have taken on other jobs "if it was a size that we could handle" but Razorback did not, in fact, turn away work because of the bridge project. Wetsell Dep. (docket entry #74, Ex. 27) at 168.

---

[3]Other UCC seller's remedies include resale remedies, *see* Ark. Code Ann. § 4-2-706, and the contract-market formula for seller's damages (the difference between the market price at the time and place of tender and the unpaid contract price together with incidental damages, but less expenses saved), *see* Ark. Code Ann. § 4-2-708(1).

[4]Dement further argues that lost profits are not available because the contract at issue was terminable at will and the parties did not contemplate lost profits as damages recoverable in the event of a breach. However, Razorback counters with testimony by Wetsell showing otherwise. Wetsell testifies: "It is well established in the concrete and construction industry that the custom and usage in the industry is that a contract to supply concrete for a job continues until the job is complete." Wetsell Aff. (docket entry #81, Attach. #20).

Wetsell's testimony clearly shows that Razorback does not qualify as a "lost volume" seller.  Furthermore, Razorback provides no evidence showing that other seller's remedies provided under the UCC are inadequate,  and it is therefore entitled to lost profits.  Accordingly, the Court finds that Dement is entitled to summary judgment with respect to Razorback's claim for lost profits.

## Punitive Damages

Razorback seeks punitive damages in connection with its fraud claim, and Dement asserts that Razorback is unable to prove the type of egregious conduct necessary to support a claim for punitive damages.  Because the Court finds no genuine issues for trial with respect to Razorback's fraud claim, the issue of punitive damages is moot.

## Attorneys' Fees

Dement asserts that no evidence supports an award of attorneys' fees in this case.  The Court finds this argument premature[5] and denies, without prejudice, Dement's motion to summarily dismiss Razorback's claim for attorneys' fees.

IT IS THEREFORE ORDERED that Defendant Dement Construction Company, LLC's motion for summary judgment (docket entry #72) is GRANTED IN PART AND DENIED IN PART.  Plaintiff Razorback Concrete Company's fraud claim and claims for punitive damages and lost profits are dismissed.  Plaintiff's claim for breach of contract remains.

IT IS FURTHER ORDERED that Defendant's motion to exclude expert opinions

---

[5] Arkansas Code § 16-22-308 permits an award of attorneys' fees to "the prevailing party." It is yet to be determined whether Razorback is a prevailing party.  Furthermore, a claim for attorneys' fees must be made by motion filed no later than 14 days after the entry of judgment. *See* Fed. R. Civ. P. 54(d).

regarding lost profits (docket entry #70), motion to bifurcate trial with respect to compensatory and punitive damages (docket entry #91), and motion for a ruling on choice of law (docket entry #92) are DENIED AS MOOT.

IT IS FURTHER ORDERED that Defendant's motion in limine (docket entry #93) is DENIED WITHOUT PREJUDICE and may be resubmitted at a time closer to trial.

IT IS SO ORDERED THIS 22nd DAY OF JANUARY, 2010.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE